## THE CRAIGEARN.

(District Court, S. D. New York. February 7, 1901.)

SHIPPING—NEGLIGENT NAVIGATION—CROWDING IN NARROW CHANNEL.

　　Evidence considered in a suit by the owner of one steamer against another to recover damages occasioned by the stranding of libelant's vessel, alleged to have been due to crowding by respondent while the vessels were passing in a narrow channel, and *held* insufficient to sustain such allegation.

In Admiralty. Suit to recover damages resulting from alleged negligent navigation.

Wing, Putnam & Burlingham, for libelant.

Convers & Kirlin, for respondent.

BROWN, District Judge. At about 7 a. m. of August 16, 1900, the libelant's steamer Simon J. Murphy, 240 feet long by 39 feet beam, 1,103 tons net register and loaded with coal, drawing 15 feet, in going eastward bound for New Haven, while going around the northerly point of North Brothers Island to the eastward of Hell Gate, stranded upon a reef of rocks that makes out about 300 feet from the northern point of that island. The libelant claims that the steamer was forced upon the reef in order to avoid a collision with the steamship Craigearn, which was coming westward, and which as the libelant claims, crowded the Murphy over to the North Brothers shore. The respondent denies any crowding, and avers that the Craigearn proceeded properly and with the proper signals, giving to the Murphy more than half the channel way.

　　The passage for deep-draft vessels is about 900 feet wide between the North Brothers Island and the northerly shore. The testimony on both sides agrees that the vessels were seen at a sufficient distance, and that the proper signals of one whistle were given by each. The weather was clear and mild, and no obstructions were in the way. The northerly shore of the passage is very bold and the water deep. Nothing prevented the Craigearn from going as far to the northward as she pleased. She was in charge of a competent pilot of very long experience; his testimony, as well as that of the officers, is that the Craigearn took her course considerably to the northward of mid-channel and did not pass at any time within 500 feet of the Murphy. The Murphy's testimony is to the effect that the Craigearn passed her when she was about opposite the North Brothers dock, which is from 300 to 500 feet to the westward of the place of stranding; that the Craigearn passed her within 80 to 100 feet having previously headed directly toward the Murphy in a very threatening manner, and thus forcing her towards the island to prevent being run down, and that the Murphy passed within 50 feet of the dock.

There are other contradictions in the evidence which it is impossible to reconcile. Upon these conflicting accounts, considering that the burden of proof is upon the libelant, it cannot be said that this burden has by any preponderance of evidence been sustained. Independently

of this consideration, the probabilities of the case upon the evidence as it stands seem to me to be clearly with the respondent rather than with the libelant. The greater number of witnesses for the Craigearn testify distinctly to her course in the northerly part of the channel. Her pilot, as I have said, was thoroughly experienced and competent; while there is some doubt whether the master of the Murphy had a thorough knowledge of the ground in his comparatively small experience in these waters or realized how far from the shore the reef extended. The natural course of the Craigearn was to keep to the starboard side of the channel way, particularly after giving her signal of one whistle, indicating that that would be her course. There were no obstructions of any kind to prevent her doing so; and the ebb tide setting to the westward around the island and making a curve in all of over three points, would naturally set the Craigearn toward the north shore. In addition to this the libelant's witness Odeon, the assistant engineer of the vessel, who had formerly been a mate, was forward of the pilot house near the stem. His attention was directed to the Craigearn's whistle. He saw her turning the point and watched her continuously, and contrary to his captain's statement, testified that the Craigearn never pointed towards the Murphy; that the Murphy was pointing towards the Craigearn and had to swing to the right to avoid running into her; that that was the way it looked to him, and that when the Murphy struck on the reef, she was still swinging to starboard. Considering that the Craigearn by her own speed and with the ebb tide, must have been moving by land from two to three times as fast as the Murphy, Odeon's statement is just as the Craigearn would naturally appear to one at the Murphy's stem, if the Craigearn was coming around the bend on the course to which the Craigearn's witnesses testify. The master of the Murphy testifies, that as soon as it was seen that he was safely passing the Craigearn, he starboarded and swung somewhat to port, though not enough to avoid the reef. Odeon, on the contrary, testifies that when the Murphy struck she was still swinging to starboard.

As the Craigearn, moreover, was going about two or three times as fast as the Murphy, had the Murphy previously been pursuing a course well away from the island, she would not have had time to get over to the island and close to the dock, on a parallel course, from the time when any threatening danger from the Craigearn would have been discernible. There was no conceivable reason for the Craigearn to be coming near or towards the dock as the master of the Murphy testifies, or for her threatening the Murphy in any manner; and the heading he assigns to the Craigearn when passing him is morally impossible if she had been so near the dock as he alleges, while it was proper enough if she was over near the north shore as her officers testify. There was, however, a very obvious motive, to which boatmen are constantly yielding, for the Murphy to go near the island, namely, to get the benefit of the eddy there instead of bucking the strong adverse tide further away; and if Odeon's testimony is true that the Murphy was swinging to starboard when she struck, it proves that the master of the Murphy did not appreciate the northerly extent of the reef and was simply running too close to the island

through lack of exact information or by miscalculation. The danger-
ous course of the Murphy was previously observed and remarked upon
by the pilot of the Craigearn. Whether the above is the true ex-
planation of the collision or not, I am satisfied that no sufficient case
is made out against the Craigearn to warrant any decree. The libel
must, therefore, be dismissed with costs.

---

### THE J. B. KING et al.

#### (District Court, S. D. New York. January 24, 1901.)

COLLISION—STEAM VESSELS PASSING IN CHANNEL—FAILURE TO SIGNAL.

    A steamer coming out through the Kills met two steam lighters with a
tow going in, and took a course somewhat towards the left shore for
the purpose of making a landing on Staten Island. The first and second
signals of the steamer, indicating her intention of passing to the right,
not being answered, instead of reversing, as was her duty, she changed
her course to the right, and came in collision with the tow. Neither ves-
sel signaled until they were within 1,000 feet of each other, although
they were in sight of each other when half a mile apart, at which dis-
tance the rules require that signals should be given; and the winding
course of the channel made the observance of the rule the more obliga-
tory, as did also, as to the lighters, the additional fact that they were
crossing the usual line of navigation of vessels coming out. *Held*, that
all three vessels were in fault, and liable for the damages to the tow.

In Admiralty. Suit for collision.

J. J. Macklin, for libelant.

Cowen, Wing, Putnam & Burlingham, for the J. B. King and the
Windsor.

Foley, Wray & Taylor, for the L. J. Busby.